DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| **THE VI CARNIVAL COMMITTEE, INC.,**       ) <br> Plaintiff,       ) <br>       ) <br> v.       ) <br>       ) <br> **JOSEPH BOSCHULTE, IAN TURNBULL, and** ) <br> **HALVOR HART, in their official capacities,**) <br> Defendants.       ) | Case No. 3:22-cv-0019 |

**ATTORNEYS:**

**Terri Griffiths, Esq.**
Griffiths Law
St. Augustine, FL
    *For Plaintiff Virgin Islands Carnival Committee,*

**Venetia H. Velazquez, Esq.**
**Ariel Marie Smith-Francois, Esq.**
Virgin Islands Department of Justice
St. Thomas, U.S.V.I.
    *For Defendants Joseph Boschulte, Ian Turnbull, and Halvor Hart.*

## MEMORANDUM OPINION

**Molloy,** *Chief Judge.*

    **BEFORE THE COURT** is Plaintiff Virgin Islands Carnival Committee's ("VICC") motion for preliminary injunction, filed March 29, 2022. (ECF No. 8.) In its motion and complaint, VICC asserts ownership over the service marks "St. Thomas Carnival" and "Virgin Islands Carnival," and seeks to enjoin Defendants from using those marks in commerce. *See* ECF Nos. 1, 8. For the reasons set forth herein, the Court finds that VICC is unlikely to succeed on the merits of its claim because its marks are not valid and enforceable. The Court will therefore deny VICC's motion.

    "Carnival in T and T is so special to all ah'we. Like we need blood in we vein, that's how we feel about Port of Spain." Destra Garcia, *Carnival*, on *Red, White, Black* (Chinese Laundry Music 2003). Carnival is deeply ingrained in Caribbean culture. The modern

tradition of Carnival has been ongoing since at least 1834, following the limited abolition of slavery in Trinidad and Tobago in 1833. Andrew Pearse, *Carnival in Nineteenth Century Trinidad*, 4 Caribbean Quarterly, June 1956, 175, 183 (1956). That is not to say that Carnival celebrations have not been held for longer, 1834 only marks the point where freed slaves were no longer arrested for engaging in Carnival celebration. *Id.* (describing the arrest of two men in masks for a "shameful violation of the Sabbath," as reported in the January 22, 1833 Port of Spain Gazette); Hollis Urban Liverpool, *Origins of Rituals and Customs in the Trinidad Carnival: African or European?*, 42 TDR, Autumn 1988, 24, 32 (1988) (citing a February 13, 1831 diary entry of a German living in Trinidad recounting, "A year ago crowds of masks were to be seen, but on this occasion we did not see a single one.").

The origin of Carnival is largely traceable to the Trinidad and Tobago celebration of "Canboulay," or "*Cannes Brulées*," Creole and French, respectively, for "canes burning." *Origins of Rituals and Customs in the Trinidad Carnival* at 30. "Before 1838, whenever sugarcane fires broke out on an estate, the enslaved Africans were sent to put them out. After the Africans were freed in 1838, according to 19th-century historian L.M. Fraser, they reenacted this event by making believe they were putting out fires." *Id.* "It would appear that the Africans deliberately set fire to the canes and their Cannes Brulées ritual was one of passive resistance, whereby they reenacted the event and laughed at the losses of their masters." *Id.* at 31.

The Canboulay reenactments eventually integrated the African tradition of "masquerade." *Id.* at 34. For masquerade, "Africans displayed disguises such as the Devil," "the Gelede masks of the Yoruba people," "Moko Jumbies on stilts like the stilt dancers of Yorubaland, Toma, Guinea, and Senegal portraying the ancestral spirits that overlooked and protected the villages and villagers," or would "pour[] molasses over their bodies (*Jab Molassie*), to indicate that, having produced it with their sweat, they were not paid for their labour." *Id.* These are in addition to "masks depicting cows, sheep, antelopes, deer, and birds," as well as "the African warrior, the *Ju Ju* mask, whereby the battles fought by Africans. . . were brought to life," and "traditional African folklore characters such as the *Soucouyant,* the *Douen*, and the *La Diablesse*. . . ." *Id.* at 34-35. Costumes would include rattles or bells,

sacred body painting, colored cloth, crowns, incised calabashes, traditional war shirts, weapons, feathers, beads, and umbrellas. *Id.* at 35.

Trinidad and Tobago Carnival originated as an annual celebration of emancipation from slavery, marked by "stickfights and masquerades all over the country." *Id.* at 36. This celebration was eventually curtailed by colonial laws aimed at ending this observance. *Id.* However, "[i]n order to preserve their traditions of masking and masquerading, the Africans found it safer to celebrate their freedom on the three days preceding Ash Wednesday...." *Id.* This is when "Carnival in T and T" is still celebrated today.

This does not mean that Carnival is limited to Trinidad and Tobago- nearly every Caribbean island has its own history and tradition permeating their respective celebrations. The Bahamas celebrates Junkanoo Carnival marking the Bahamian emancipation from slavery in 1884. *The Joy of Junkanoo*, www.bahamas.com/events/junkanoo. Crop Over Festival in Barbados has celebrated the sugar cane harvest in late July since the 17th century, later evolving to incorporate elements found in other Caribbean Carnivals. *Barbados Crop Over Festival*, www.barbados.org/cropover.htm. At issue today is the Virgin Islands Carnival Committee's purported ownership of service marks to St. Thomas Carnival and Virgin Islands Carnival.

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

The origin of St. Thomas Carnival dates at least as far back as 1912. St. Thomas Carnival has not, however, been held consistently since that time. After an undetermined delay, then-radio host (later Virgin Islands Senator and United States Congressional Delegate) Ron de Lugo organized a group to revive Carnival in St. Thomas in 1952, forming a *de facto c*arnival committee. Virgin Islands Carnival Committee as a legal entity was incorporated on February 27, 1976, and performed activities directly related to organizing St. Thomas Carnival continuously thereafter until 2019.

On December 4, 2004, VICC applied to register the service mark "Virgin Islands Carnival" with the United States Patent and Trademark Office ("USPTO"). On December 7,

---

[1] All facts herein are adduced from testimony and exhibits introduced at the hearing on VICC's motion for preliminary injunction, held April 7 and 8, 2022.

2004, VICC applied to register the service mark "St. Thomas Carnival." Both applications were initially denied due to the phrase "Carnival" being a generic term, and the terms "St. Thomas" and "Virgin Islands" being geographical descriptors of a generic term. Following an appeal, VICC acquired the service mark for "St. Thomas Carnival" on January 2, 2007, and acquired the service mark for "Virgin Islands Carnival" on February 6, 2007. The applications were both based on the attestation that VICC had made substantially exclusive and continuous use of the marks.

Despite this, at all times testified to, the single event "St. Thomas Carnival" and "Virgin Islands Carnival" has been held in concert with the Government of the Virgin Islands ("GVI"). Indeed, witness testimony indicated that that putting on Carnival was financially impossible for VICC without GVI providing venues, police support, free power and water supplies, EMT services, and the lion's share of the budget. VICC's only two paid employees were paid entirely with appropriations by GVI to VICC for carnival specifically. There is no testimony indicating that VICC as an incorporated entity put on a single Carnival without working in conjunction with GVI and with substantial government appropriations.

In 2019, Act 8153 of the Virgin Islands Legislature was signed into law. Act 8153 established the Division of Festivals under the Department of Tourism and tasked the newly founded division with duties related to the promotion and execution of St. Thomas Carnival, as well as similar celebrations on St. Croix and St. John. *See* 3 V.I.C. § 339a. The Division of Festivals thereafter assumed its duties, finally promoting on an event branded as "St. Thomas Carnival V.I." and "St. Thomas Carnival Virgin Islands" scheduled for April 2022 following the loosening of COVID-19 related restrictions. The event was marketed as substantively identical to past Carnivals co-promoted with VICC, to the extent that GVI branded the 2022 Carnival as the "70th Anniversary" of Carnival in the Virgin Islands. This Act and the subsequent Government action is the driving force behind VICC's complaint and motion for preliminary injunction.

On March 28, 2022, VICC filed its Complaint, alleging three causes of action: Count 1 alleged an unconstitutional taking under the Fifth Amendment against all defendants, Count 2 alleged Lanham Act Trademark Infringement against the individual defendants, and Count

3 alleged Lanham Act Unfair Competition against the GVI. *See generally* ECF No. 1. On April 15, 2022, VICC filed its first motion to amend its complaint, which alleges the same three causes of action. *See generally* ECF No. 35-2. The motion itself was unnecessary, as VICC was permitted to amend its pleading as a matter of course. *See* Fed. R. Civ. P. 15(a)(1).

On April 19, 2022, prior to defendants answering VICC's complaint, VICC filed a notice of voluntary dismissal, dismissing the Department of Tourism and the unfair competition count. *See* ECF No. 39. Accordingly, the Department of Tourism has been dismissed from this action pursuant to Fed. R. Civ. P. 41(a)(i) without further Order of the Court. Attached to VICC's notice of voluntary dismissal is a second "First Amended Verified Complaint," which removes Department of Tourism and Count 3. This leaves two counts before the Court: Count 1, alleging an unconstitutional taking under the Fifth Amendment against the individual defendants and Count 2, alleging Lanham Act Trademark Infringement against the individual defendants.

On March 29, 2022, VICC filed its "Motion for Hearing TRO." *See* ECF No. 8. On April 1, 2022, VICC's motion was denied to the extent that it sought a temporary restraining order and granted to the extent that it sought a preliminary injunction hearing. *See* ECF No. 10. In its motion, VICC seeks a preliminary injunction against defendants, enjoining them from further trademark infringement until this matter may be heard on the merits. *See generally* ECF No. 8.

An evidentiary hearing was held on VICC's motion for preliminary injunction on April 7-8, 2022. Attorney Terri Griffiths, Esq. appeared for VICC and Attorneys Venetia Velazquez, Esq. and Ariel Smith-Francois, Esq. appeared for all defendants. At the conclusion of the April 8 hearing, counsel for VICC requested fourteen days to file a brief in lieu of oral argument. VICC filed its brief on April 30, 2022. (ECF No. 40.) The individual defendants filed their response on May 13, 2022 (ECF No. 44) and VICC filed a reply on May 24, 2022 (ECF No. 45.)

In its motion, VICC seeks to enjoin the GVI, through three individual officers of the Department of Tourism in their official capacities, Commissioner Joseph Boschulte ("Boschulte"), Director of the Division of Festivals Ian Turnbull ("Turnbull"), and Assistant Director of the Division of Festivals Halvor Hart ("Hart") (collectively, "the individual

defendants"), from using the phrases "St. Thomas Carnival" and "Virgin Islands Carnival" in commerce. *See generally* ECF No. 8. This motion is now ripe for the Court's determination.

## II. LEGAL STANDARD

The test for preliminary relief is a familiar one. A party seeking a preliminary injunction must show: "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (citing *Allegheny Energy, Inc. v. DQE, Inc.,* 171 F.3d 153, 158 (3d Cir. 1999)). Preliminary injunctive relief is "an extraordinary remedy" and "should be granted only in limited circumstances." *American Tel. & Tel. Co. v. Winback & Conserve Program, Inc.,* 42 F.3d 1421, 1427 (3d Cir. 1994) (quotation omitted). "[O]ne of the goals of the preliminary injunction analysis is to maintain the status quo, defined as the last, peaceable, noncontested status of the parties." *Opticians Ass'n of Am. v. Indep. Opticians of Am.,* 920 F.2d 187, 197 (3d Cir. 1990) (citation and quotation omitted); *see also Kos Pharms., Inc.*, 369 F.3d at 708 (citing 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 30:50 (4th ed. 2003) ("The status quo to be preserved is not the situation of contested rights. . .. In a trademark case, [it] is the situation prior to the time the junior user began use of its contested mark: the last peaceable, non-contested status.")).

## III. DISCUSSION

As a preliminary matter, the Court finds that defendants were not properly served. At the April 7 hearing, VICC stated that they "served the AG on behalf of the Governor" and "each of the three defendants [were] personally in-hand serviced." Apr. 7 Hr'g Tr. at 7. VICC did not serve the Governor of the Virgin Islands, and no evidence appears on the record prior to April 7, 2022, indicating to the contrary. Federal rules require that, when serving a state government or any other state created governmental organization, a plaintiff must deliver a copy of the summons and of the complaint to its chief executive officer or serve a copy of each in the matter prescribed by that state's law. Fed. R. Civ. P. 4(j)(2). Under Virgin Islands law, when suing the GVI or its agencies a plaintiff must serve a summons and a copy of the

complaint on the Governor and the Attorney General. V.I. R. Civ. P. 4(i)(1). Additionally, when suing an officer or employee of the GVI in their official capacity, service must be made upon the Governor and the Attorney General, as well as serve both the chief executive officer of the individual agency and the individual. V.I. R. Civ. P. 4(i)(2)(A). An action against a government official in their official capacity is necessarily an action against the government. *See, e.g., Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (holding that "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.")

Here, VICC served the Attorney General and the three individual defendants. Incidentally, Commissioner Boschulte is the chief executive officer of the Department of Tourism, so the requirement to serve a copy of the summons and complaint upon the chief executive officer of the relevant agency is satisfied. However, VICC has not yet served the Governor. Therefore, the Court has not yet acquired personal jurisdiction over any defendant in this matter. *Lampe v. Xouth, Inc.*, 952 F.2d 697, 700-01 (3d Cir. 1991) ("A court obtains personal jurisdiction when the complaint and summons are properly served on the defendant. Effective service of process is therefore a prerequisite to proceeding further in a case.").[2]

Fortunately for VICC, service of process comporting with Fed. R. Civ. P. 4 is not required for a preliminary injunction. The sole requirement is that a preliminary injunction may issue "only on notice to the adverse party." Fed. R. Civ. P. 65(a)(1). Here, the Court has no doubt that the defendants were on notice. Thus, while notice is sufficient for the Court to rule on the motion for preliminary injunction, the fact remains that VICC has not yet properly served defendants with the complaint filed March 28, 2022, more than 120 days ago.

Next, VICC argues at length that a preliminary injunction should be issued pursuant to the Takings Clause of the Fifth Amendment to the United States Constitution. *See* ECF No. 40, at 4-9. However, VICC waived preliminary injunctive relief as to its Takings count at the hearing held April 7, 2022. Apr. 7 Hr'g Tr. at 18 (The Court: ". . . Attorney Griffiths, would you agree or disagree that with regards to the Fifth Amendment takings count that that's unlikely

---

[2] Counsel for defendants entered limited appearances to contest the motion for preliminary injunction while objecting to the Court's jurisdiction. *See* ECF No. 13, 14.

to be subject to an irreparable harm issue?" Ms. Griffiths: "Yes, we agree." The Court: "Okay. So then –" Ms. Griffiths: "It's not within the scope of the hearing today."). Because VICC explicitly declined to proceed on its Takings theory in the preliminary injunction hearing, VICC has waived preliminary injunctive relief on that count, regardless of the argument to the contrary waived in its brief.

The first element VICC is required to prove to succeed in its motion for preliminary injunction is that it is likely to succeed on the merits. Here, VICC elected to proceed on a single violation of the Lanham Act. Apr. 7 Hr'g Tr. at 18 (The Court: "So then, we're going to be focused on the Lanham Act claims with regards to the four elements of the preliminary injunction using the substantive elements of that cause of action?" Ms. Griffiths: "Yes, Your Honor."). Specifically, VICC argues that it owns federally registered service marks to "St. Thomas Carnival" and "Virgin Islands Carnival," and that the individual defendants have infringed on its exclusive rights by promoting "St. Thomas Carnival V.I." following the passage of 3 V.I.C. § 339a. *See* ECF No. 8, at 6-7.

To remedy this infringement, VICC seeks injunctive relief pursuant to 15 U.S.C. § 1114(b) of the Lanham Act. This section states in relevant part:

> "(1)Any person who shall, without the consent of the registrant—
> . . .
> (b)reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,
>
> shall be liable in a civil action by the registrant for the remedies hereinafter provided. Under subsection (b) hereof, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive."

15 U.S.C. § 1114(b). To prove federal trademark infringement under the Lanham Act, "a plaintiff must demonstrate that (1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion." *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,* 237 F.3d 198, 210 (3d Cir. 2000) (citing *Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency*, Inc., 214 F.3d 432, 437 (3d Cir. 2000)). The plaintiff bears the burden of proof. *Id.* at 210-11 (citing *American Home Prods. Corp. v. Barr Labs., Inc.*, 834 F.2d 368, 371 (3d Cir. 1987)). The Court will turn first to whether VICC's service marks are valid and legally protectable.

"The first two requirements, validity and legal protectability, are proven where. . . a mark was federally registered and has become 'incontestable' under the Latham Act, 15 U.S.C. §§ 1058 and 1065." *Fisons Horticulture, Inc. v. Vigoro Industries, Inc.*, 30 F.3d 466, 472 (3d Cir. 1994) (citing *Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277, 291 (3d Cir. 1991), *cert. denied*, 502 U.S. 939). To achieve incontestability, a trademark holder must file an affidavit in its sixth year of ownership, evincing continuous use in commerce for five years following registration. *See* 15 U.S.C. § 1065(3). Here, VICC presented no evidence that such an affidavit was filed. Further, VICC may not apply for incontestability until this case is resolved. 15 U.S.C. § 1065(2). Therefore, its marks are not "incontestable."

"If the mark has not been federally registered or, if registered, has not achieved incontestability, validity depends on proof of secondary meaning. . .." *Fisons Horticulture*, 30 F.3d at 472 (citing *Ford Motor*, 930 F.2d at 291). Secondary meaning is demonstrated where, "in the minds of the public, the primary significance of a product feature or term is to identify the source of the product itself." *Ford Motor Co.*, 930 F.2d at 292 (quoting *Freixenet, S.A. v. Admiral Wine & Liquor Co.,* 731 F.2d 148, 152 (3d Cir. 1984)). "Although there are numerous cases determining secondary meaning, there is no consensus on its elements." *Amer. Scientific Chem., Inc. v. Amer. Hosp. Supply Corp.*, 690 F.2d 791, 792 (9th Cir. 1982). A non-exclusive list of factors which may be considered includes "the extent of sales and advertising leading to buyer association, length of use, exclusivity of use, the fact of copying, customer surveys, customer testimony, the use of the mark in trade journals, the size of the company,

the number of sales, the number of customers, and actual confusion." *Ford Motor Co.,* 930 F.2d at 292 (collecting cases).

Here, there has been no exclusivity of use. To the contrary, numerous witnesses testified that for as long as VICC as an entity was involved in St. Thomas Carnival, it was always a joint venture with the GVI. Indeed, this is evinced by the fact that putting on Carnival was financially impossible for VICC without the GVI providing its venues, police support, free power and water supplies, EMT services, the lion's share of the budget, and other services. *See, e.g.,* Apr. 7 Hr'g Tr. at 143-46; 155-57; 222. VICC's only two paid employees were paid entirely with appropriations by GVI to VICC for carnival specifically and were not paid until the GVI appropriations were received. *Id.* at 303. For these reasons, too, the length of use factor is of little import here. There has been no evidence of buyer association with St. Thomas Carnival as specifically promoted by VICC, especially where all sales and advertising has been wholly funded by GVI. There has been no evidence of a tangible number of sales, nor any of the use of trade journals by VICC. Therefore, the Court finds that there is no legally significant secondary meaning attributed to VICC's use of "St. Thomas Carnival" and "Virgin Islands Carnival."

"In order to qualify for Lanham Act protection, a mark must either be suggestive, arbitrary, or fanciful, or must be descriptive with a demonstration of secondary meaning. Generic marks receive no protection; indeed, they are not 'trademarks' at all." *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,* 237 F.3d 198, 222 (3d Cir. 2000) (internal citations omitted). Arbitrary or fanciful marks use terms that neither describe nor suggest anything about the product; they "bear no logical or suggestive relation to the actual characteristics of the goods." *Id.* at 221 (citation omitted). Suggestive marks require consumer "imagination, thought, or perception" to determine what the product is. *Id.* at 221-22 (citation omitted). Descriptive terms "forthwith convey[ ] an immediate idea of the ingredients, qualities or characteristics of the goods." *Id.* at 222 (citation omitted). Generic marks are those that "function as the common descriptive name of a product class." *Id.* (citation omitted).

Here, the USPTO has already held that the phrase "Carnival" is generic, leaving only the terms "St. Thomas" and "Virgin Islands" to convey protectable meaning. At best, the phrases "St. Thomas" and "Virgin Islands" as used by VICC are descriptive geographical indicators which, absent a secondary meaning, are not eligible for trademark protection. *See id*. Indeed, this view corresponds with the USPTO's initial denial of VICC's applications for service marks on "St. Thomas Carnival" and "Virgin Islands Carnival."

However, the classification of these marks as "descriptive" is generous. Rather, the Court finds that "St. Thomas" and "Virgin Islands" as used in VICC's marks are generic, as they merely "function as the common descriptive name of a product class," namely, the St. Thomas, U.S. Virgin Islands iteration of traditional Caribbean Carnival – itself a generic term. *Id.* As a combination of generic terms, the Court finds that "St. Thomas Carnival" and "Virgin Islands Carnival" "receive no protection; indeed, they are not 'trademarks' at all." *Id.* Absent a valid and legally protectable service mark, the Court finds that VICC is extremely unlikely to succeed on the merits of its Lanham Act claim without further analysis.[3] For this reason, the Court will deny VICC's motion for preliminary injunction.

## IV. CONCLUSION

For the reasons set forth above, the Court finds that VICC's service marks for "St. Thomas Carnival" and "Virgin Islands Carnival" are not incontestable under 15 U.S.C. § 1065. VICC has failed to prove a legally significant secondary meaning for its service marks "St. Thomas Carnival" and "Virgin Islands Carnival." Further, the Court finds that the service marked phrases are generic, and therefore neither valid nor legally protectable. For this

---

[3] In a trademark infringement action, the Court would ordinarily proceed to analyze whether VICC owns the disputed service marks, then evaluate the likelihood of confusion between the parties' marks by weighing the factors enumerated in *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460 (3d Cir. 1983). However, because the Court finds that VICC is unlikely to succeed on the first element of its trademark infringement claim, in that the marks "St. Thomas Carnival" and "Virgin Islands Carnival" are neither valid nor protectible, the Court declines to address these additional elements. Moreover, because the Court finds that VICC is unlikely to succeed on the merits of its claim, the Court further declines to reach the additional elements of VICC's motion for preliminary injunction. If VICC does not hold valid and protectible marks and is unlikely to succeed on the merits of its Lanham Act claim, it is irrelevant whether it will suffer harm by permitting Defendants to continue using those marks in commerce. Likewise, the balancing of the harms and public policy considerations each clearly favor permitting defendants to continue using marks that are not valid or protectible without injunctive interference.

*V.I. Carnival Committee v. Boschulte, et al.*
Case No. 3:22-cv-0019
Memorandum Opinion
Page 12 of 12

reason, VICC is exceedingly unlikely to succeed on the merits of its Lanham Act claim and its motion for preliminary injunction fails.

    A separate Order consistent with this Memorandum Opinion follows.

**Date:** August 8, 2022                                      */s/ Robert A. Molloy*
                                                                                   **ROBERT A. MOLLOY**
                                                                                   **Chief Judge**